## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### PARKERSBURG

JEREMY T. NEWHART,

      **Plaintiff,**

v.                                      **CASE NO. 6:13-cv-01606**

CAROLYN W. COLVIN,
**Acting Commissioner of Social Security,**

      **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433.  By standing order, this case was referred to this United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B).  Presently pending before the Court are Plaintiff's Brief in Support of Judgment on the Pleadings (ECF No. 11), Brief in Support of the Defendant's Decision (ECF No. 12) and Plaintiff's Response to Defendant's Brief (ECF No. 13).

Claimant, Jeremy T. Newhart, filed his application on July 1, 2010. In the application, Complainant alleged disability beginning March 1, 2009, from bipolar depression and back injury (Tr. at 155).  The claim was denied initially and upon reconsideration. Claimant filed a written request for hearing on November 3, 2010.  A hearing was held on November 14, 2010. Claimant appeared via video hearing in Parkersburg, West Virginia.  In the Decision dated December 1, 2011, the Administrative Law Judge (ALJ) determined that Claimant was not entitled to benefits (Tr. at 10-22).

On February 16, 2012, Claimant requested a Review by the Appeals Council.   On December 18, 2012, the Appeals Council notified Claimant that his request for review was denied because the Appeals Council "found no reason under our rules to review the Administrative Law Judge's decision" (Tr. at 1).   On January 30, 2013, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g) (ECF No. 2).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability.   *See Blalock v. Richardson*, 483 F.2d 773, 774 (4th Cir. 1972).   A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.   20 C.F.R. § 404.1520, 416.920 (2012).   If an individual is found "not disabled" at any step, further inquiry is unnecessary.   *Id.* §§ 404.1520(a), 416.920(a).   The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.   *Id.* §§ 404.1520(b), 416.920(b).   If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.   *Id.* §§ 404.1520(c), 416.920(c).   If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.   *Id.* § 404.1520(d), 416.920(d).   If it does, the claimant is found disabled and awarded benefits.   *Id.* If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.   *Id.* § 404.1520(e), 416.920(e).   By satisfying inquiry four, the claimant establishes a *prima facie* case of disability.   *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).

The burden then shifts to the Commissioner, *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.  20 C.F.R. §§ 404.1520(f), 416.920(f) (2012).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job and (2) that this specific job exists in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date (Tr. at 12). Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of post laminectomy syndrome, occipital neuralgia, depression and anxiety.  At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1 (Tr. at 14).  The ALJ then found that Claimant has a residual functional capacity ("RFC") limiting him to unskilled work, reduced by nonexertional limitations (Tr. at 15).  As a result, Claimant cannot return to his past relevant work (Tr. at 20).  Nevertheless, the ALJ concluded that Claimant could perform jobs such as sorter/inspector, an assembler and machine operator (Tr. at 21).  On this basis, benefits were denied (Tr. at 22).

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.  In *Blalock*, substantial evidence was defined as:

Evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'  *Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)).

Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence.  *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Nevertheless, the Courts must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.  *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on March 30, 1972 (Tr. at 152).  Claimant graduated high school and obtained an Associate Degree in welding technology (Tr. at 34, 156).  He previously worked as a furnace operator/head tapper and a welder (Tr. at 156).  Claimant stopped working on March 1, 2009.

The Medical Record

On Claimant's DIB application dated July 2, 2010, he asserted that he became unable to work on March 1, 2009, because of his "disabling condition" (Tr. at 122, 155).  Physicians' progress notes and office visit notes reflect that Claimant has asserted on numerous occasions that he was laid off from work in March 2009 (Tr. at 235, 237, 241, 243, 245).  Claimant's activities include fishing, working on his cars,  watching television, attending church, driving,

feeding pets, taking a walk "every now and then," mowing the lawn, running the sweeper and occasionally cleaning dishes (Tr. at 34-37, 167-174, 651).

Evidence and testimony were placed on the record addressing Claimant's medical conditions and treatments over the past decade.  On May 9, 2001, Claimant underwent an Initial Psychiatric Evaluation at Worthington Center, Inc., performed by Charles Snyder, M.D. (Tr. at 506-508).  Claimant's Chief Complaint was high anxiety and depression (Tr. at 506).  On August 2, 2001, Claimant's Physician's Progress Note from Worthington Center Inc. listed Claimant as suffering from panic attacks with agoraphobia and depression (Tr. at 633).  The Physician's Progress Note quoted Claimant as having said "I'm wonderful. 100% improved."  (*Id.*)  The Physician's Progress Note on January 22, 2002, listed Claimant's symptoms as panic and "a little" depression (Tr. at 624).

Claimant testified to suffering from back pain and headaches (Tr. at 42).  Claimant's surgical history includes a lumbar microdiscectomy surgery by Robert J. Crow, MD, in December 2007 (Tr. at 638).  Dr. Crow's office visit note on January 28, 2008, a month after Claimant's lumbar microdiscectomy surgery on the L5-S1, stated that Dr. Crow recommended Claimant "go back to work full duty whenever he would like" (Tr. at 641).  Claimant returned to work at full duty without restriction (Tr. at 340).  When asked at the administrative hearing how he hurt his back, Claimant responded "To be truthful, I really don't know" (Tr. at 35).

On March 14, 2008, a Physician's Progress note from Worthington Center, Inc. reported Claimant's Chief Complaint as feeling sad and anxious at times (Tr. at 269).  Claimant reported he was "Doing OK" and that his "Meds are OK."  (*Id.*) Claimant was diagnosed with depression

and panic disorder caused by agoraphobia[1] (Tr. at 270). An Extended Review of Systems found that Claimant had a herniated disc and gastroesophageal reflux disease (GERD).  (*Id.*)   On March 18, 2008, Michael Shramowiat, M.D., examined Claimant.  Claimant's Chief Complaint was occasional pain in his neck and right thigh.

On March 22, 2008, the Physician's Progress Note from Worthington Center, Inc. reflects that Claimant's Chief Complaint was heavy panic attacks (Tr. at 267).  Claimant's diagnosis was depression with panic disorder caused by agoraphobia (Tr. at 268).   On May 20, 2008, Claimant's Chief Complaint was depression (Tr. at 266).   Claimant was diagnosed with depression and panic disorder caused by agoraphobia.

On July 2, 2008, Claimant's Chief Complaint was that he was nervous and that he had been irritating people at work.  On July 3, 2008, Claimant called Worthington Center, Inc. stating that he took a dose of the prescription Abilify, which can treat bipolar/schizophrenic disorder, that morning and was suffering from an erection "off and on all morning" (Tr. at 261).  Claimant's office visit note on July 11, 2008, states that Claimant's Chief Complaint was that he stopped taking Abilify because it caused the side effect of a sustained erection (Tr. at 259).

On February 4, 2009, an office visit note from Worthington Center, Inc. reports that Claimant's Chief Complaint was severe depression.  Claimant did not present any complaints of sleep disturbance.  Claimant reported that he broke up with his girlfriend and would be losing his job in March (Tr. at 245). Claimant stopped working on March 1, 2009.  Claimant asserts his disability onset date was March 1, 2009.  On March 4, 2009, the office visit note lists Claimant's Chief Complaint as depression.  Claimant did not present any complaints of sleep disturbance.

---

[1] Agoraphobia is a type of anxiety disorder in which you avoid situations that you're afraid might cause you to panic.  See www.mayoclinic.com, last visited on November 14, 2014.

Claimant reported that he was laid off from work and would be losing his insurance in two weeks (Tr. at 243).

On October 22, 2009, Claimant returned to Dr. Shramowiat with claims of headache and neck pain with occasional pain in his right leg (Tr. at 337).  Dr. Shramowiat diagnosed Claimant with greater occipital neuralgia (Tr. at 338).  Dr. Shramowiat administered a bilateral greater occipital nerve block injection on November 18, 2009 (Tr. at 336).  Dr. Shramowiat's Progress Note states that Claimant "is currently laid off from his employment."  (*Id.*)

On June 22, 2009, an office visit note from Worthington Center, Inc. reports Claimant's Chief Complaint to be "some depression."  Claimant was concerned about the side effect of weight gain although Risperdal, a prescription drug intended to treat schizophrenia and bipolar disorder, was helping his mood swings (Tr. at 237).  During the office visit he reported that he had been laid off from work and collecting unemployment.  (*Id.*)  The office note listed Claimant's diagnosis as depressive and bipolar.  Claimant was not sleeping well.  Claimant testified at the administrative hearing that he has trouble sleeping because his "mind wanders." He testified to taking two "sleeping pills" and two 450 mgs of lithium at night.  Claimant testified that he took the lithium for his "mood" (Tr. at 43).

On October 8, 2009, Amelia McPeak, D.O., a psychiatrist at Westbrook Health Services, completed a Comprehensive Psychiatric Assessment of Claimant (Tr. at 323-324).  Claimant's Chief Complaint was reported as a long history of bipolar disorder and anxiety (Tr. at 714, 323). The office visit note states that "The patient reports, 'I need my medications.'"  Claimant's insight and judgment were reported as fair (Tr. at 324).  Claimant's medications were listed as

Vicodin[2], Clonozepam, Ambien CR, Celexa and Invega[3].  Claimant's past psychiatric history states that he has been in outpatient mental health treatment for the last 15 to 18 years.  (*Id.*)

On October 28, 2009, an office visit with Dr. McPeak reported that Claimant was "struggling with a lot of symptoms of anxiety" (Tr. at 322).   Under the Mental Status Examination, Claimant's attitude was reported as "somewhat uncooperative" and his insight and judgment were fair.  Under the Assessment and Plan, Dr. McPeak reported that Claimant was psychiatrically stable on his current medications.  (*Id.*)

On November 19, 2009, Claimant's routine office visit with Dr. McPeak reported that Claimant was "complaining that his medications were giving him too much sexual side effects." For mood stabilization, Claimant agreed to discontinue Celexa and begin Remeron (Tr. at 321). Under mental status examination, Claimant's insight and judgment were fair.  The Assessment and Plan stated that Claimant "will discontinue Celexa due to sexual side effects. [Claimant] will begin Remeron… to target symptoms of depression and anxiety." (*Id.*)

On December 10, 2009, Claimant's routine office visit with Dr. McPeak reported that Claimant requested to "try a different mood stabilizer."   Claimant was concerned about his medications causing too much weight gain and sexual side effects (Tr. at 320).  Under Mental Status Examination, Claimant's insight and judgment were reported as fair.  On January 5, 2010, Claimant's routine office visit with Dr. McPeak reported mood swings and irritability.  Claimant

---

[2] Dr. McPeak's notes report that Claimant is prescribed Vicodin for headaches through Michael Morehead, MD.

[3] Invega is a prescription for the treatment of schizophrenia.  *See* www.invega.com, last reviewed on November 5, 2013.

requested to stop taking the prescription of Remeron[4] due to weight gain and possible sexual side effects (Tr. at 319).

On January 18, 2010, Claimant reported persistent low back pain radiating down the right lower extremity to Dr. Shramowiat (Tr. at 335).  The Progress Note states "He is not working at this time.  He is laid off."

On February 3, 2010, Claimant's routine office visit with Dr. McPeak reported Claimant's anxiety and insomnia were manageable.  Claimant denied any symptoms of hopelessness (Tr. at 318).  Claimant's insight and judgment were reported as fair.  On March 10, 2010, Claimant's routine office visit reported that Claimant was "battling with sleep" (Tr. at 317).  Claimant's Mental Status Examination reported his insight and judgment were fair.  Dr. McPeak's Assessment and Plan reported that Claimant was still battling with depression and low mood.

On March 15, 2010, Dr. Shramowiat's Progress Note addresses Claimant's surgery performed by Dr. Crow (Tr. at 334).  "Over the past month he has developed increasing low back pain which does cause some radiculopathy to the right lower extremity.  I am unsure why he is having more symptoms."  (*Id.*)  Claimant was administered a bilateral greater occipital nerve block.

On March 24, 2010, Claimant's routine office visit with Dr. McPeak reported that Claimant reported to feeling "much better" and that he was "tolerating the medications well without side effects" (Tr. at 316).  Claimant's insight and judgment were found to be good.  On

---

[4] Remeron is an antidepressant medication used to treat a variety of conditions, including depression and other mental/mood disorders.  See www.webmd.com, last reviewed on November 6, 2013.

April 21, 2010, Claimant's routine office visit with Dr. McPeak reported that Claimant continues having symptoms of depression and anxiety (Tr. at 319).

Examination notes from Marietta Health Care on June 22, 2010, and June 27, 2010, reported that Claimant experienced improvement in pain and was currently looking for a job (Tr. at 271).   Claimant's June 30, 2010, office visit note by Dr. McPeak, stated that Claimant's insight and judgment were assessed under Mental Status Examination as fair (Tr. at 312). Claimant reported having a lot of problems with daytime anxiety.   (*Id.*)   Claimant denied "any significant symptoms of depression or low mood."   Claimant requested a prescription change from Cialis to Viagra.

Dr. McPeak completed a Routine Mental Form for the State of West Virginia's Disability Determination Section (WVDDS) on August 20, 2010 (Tr. at 308-311).   Dr. McPeak based the Routine Mental Form responses according to Claimant's June 30, 2010, office visit.   Dr. McPeak reported that Claimant alleges bipolar disorder, depression and back injury.   Dr. McPeak reported Claimant's speech perceptual and thought content were normal.   Claimant did not present any delusions, hallucinations, suicidal ideations or homicidal ideations.   Claimant's mood was anxious and irritable.   His affect was restricted and his psychomotor activity was within normal limits (Tr. at 309).   Claimant's judgment and insight were mildly deficient.   The August 20, 2010, Routine Mental Form for the Disability Determination Section was the first time Dr. McPeak found that Claimant's insight and judgment were mildly deficient instead of fair or good (Tr. at 309).   Although, the August 20, 2010, Routine Mental Form was based on Claimant's June 30, 2010 visit, Dr. McPeak noted on June 30, 2010, that Claimant's insight and judgment were fair, not mildly deficient as she stated on the WVDDS Routine Mental Form.

Dr. McPeak reported on the WVDDS's Routine Mental Form that Claimant's functional capacities of immediate and recent memory to be normal.  Claimant's social functioning, task persistence and pace were mildly deficient.  Dr. McPeak diagnosed Claimant with bipolar disorder, episodes of depressed mood without psychosis and generalized anxiety disorder (Tr. at 311).  (*Id.*)

On September 13, 2010, Fulvio Franyutti, M.D., performed a Physical Residual Functional Capacity Assessment of Claimant (Tr. at 280-287).  Dr. Franyutti found Claimant's exertional limitations to include: occasionally lift and/or carry 20 pounds or less; frequently lift and/or carry 10 pounds or less; stand and/or walk with normal breaks for a total of 6 hours in an 8 hour workday; sit with normal breaks for a total of 6 hours in an 8 hour workday; and, unlimited pushing and/or pulling the weight limitations stated above (Tr. at 281).  Dr. Franyutti found Claimant to be unable to climb ladders, ropes and scaffolds (Tr. at 282).   Claimant was found able to occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. (*Id.*) Dr. Franyutti found Claimant to possess no manipulative, communicative and visual limitations (Tr. at 283-284).   Claimant's environmental limitations stated that Claimant should avoid concentrated exposure to extreme cold, extreme heat, vibration, fumes, odors, dusts, gases, poor ventilation, etc. and hazards.  Claimant was not found to possess environmental limitations regarding wetness, humidity, noise and vibration.  Under the Additional Comments section, Dr. Franyutti reported that Claimant previously underwent laparoscopic hiatal hernia repair in January 2009.  Claimant received nerve blocks in his occipital nerve, on October 22, 2009 and April 13, 2010, which was causing Claimant moderate to severe pain.  Claimant's upper and lower extremities were rated as 5 out of 5 in strength.  The Additional Comments referred to self-reported forms which stated that Claimant had no problems with personal care, he complained of

low back pain and headaches, sleep disturbance, difficulty lifting, squatting, bending, standing and talking. Claimant reported to taking ibuprofen and Excedrin Migraine for his headaches and Vicodin[5] and Robaxin for back pain (Tr. at 287). Claimant reported to mowing the lawn, vacuuming, washing dishes, driving, shopping and watching TV. Dr. Franyutti found Claimant to be "partially credible." (*Id.*)

On September 15, 2010, office visit notes from Dr. McPeak reported that Claimant denied any symptoms of severe depression and low mood. He was reported as "still pretty stressed out about financial issues and awaiting disability" (Tr. at 327). Claimant's insight and judgment were reported as fair under Mental Status Evaluation, as opposed to mildly deficient as reported on the WVDDS Routine Mental Form dated August 20, 2010. The assessment and plan of Dr. McPeak stated that Claimant was psychiatrically stable at that present time on his medications "except for financial stressors and lack of employment. Awaiting disability." (*Id.*)

Jeff L. Harlow, PhD, completed a Mental Residual Functional Capacity Assessment of Claimant on September 25, 2010 (Tr. at 303-306). Dr. Harlow did not find Claimant to be significantly limited in any area of understanding and memory, sustained persistence, sustained concentration and persistence and adaptation (Tr. at 304-305). Under the category of social interaction, Claimant was found to be moderately limited in his ability to interact appropriately with the general public, ability to accept instructions and respond appropriately to criticism from supervisors, ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes and ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness (Tr. at 305). Additionally, under social interaction, Dr. Harlow found Claimant was not significantly limited in the ability to ask simple questions or

---

[5] On October 8, 2009, Claimant reported to Dr. McPeak that the Vicodin was prescribed for headaches.

request assistance. The Functional Capacity Assessment of Dr. Harlow found Claimant to suffer from bipolar disorder and generalized anxiety mental disorders which cause some limitations in specific functional capacities. Dr. Harlow stated that said limitations are of a moderate nature, or less (Tr. at 306). Dr. Harlow's assessment concluded that Claimant "can perform repetitive work-related activities." (*Id.*)

Gongqiao Zhang, Dr. McPeak's Physician Assistant, conducted a routine office visit on October 11, 2010 (Tr. at 325-326). Claimant reported to be stable with some problems of daily anxiety (Tr. at 325). Claimant denied any significant symptoms of depression or low mood. Claimant stated that his current medications were "working pretty well." Under Mental Status Examination, Claimant's insight and judgment were fair.

Claimant was admitted to Appalachian Behavioral Healthcare due to depression with suicidal ideation of shooting himself on August 15, 2011 (Tr. at 707, 650). A Mental Status Examination was performed on Claimant at the time of admission. Claimant was found to possess an organized, nonpsychotic thought process (Tr. at 651). His concentration was reported as adequate and his immediate, intermediate and long-term memory was assessed as intact (Tr. at 652). Claimant's intellectual functioning was reported as average and his judgment and insight were reported as fair. (*Id.*) Claimant reported that he took four Vicodin a day and believed he had become addicted to Vicodin (Tr. at 651). Claimant self-reported that he "worked as a welder for 15 years and has been on disability for one year due to his back pain" (Tr. at 651, 656). Claimant was diagnosed with opioid dependence (Tr. at 657). Claimant was discharged on August 16, 2011, with instructions to attend follow up appointments with Dr. McPeak. On August 19, 2011, Claimant was seen by Dr. McPeak. Dr. McPeak reported that Claimant was "in active opiate withdrawal" (Tr. at 733).

Office visit notes of Dr. Crow dated September 29, 2011, reflect that Claimant experienced relief after his surgery in December 2007, "until approximately seven to eight months ago when without a precipitating event he developed midline bilateral low lumbar pain, pain in the bilateral buttocks, bilateral thighs, right leg down the anterior leg to the foot, left leg intermittently similar symptoms." Dr. Crow lists Claimant's past medical history to include anxiety disorder, low lumbar back pain and depression. (*Id.*) Dr. Crow's review of an MRI of Claimant's lumbar on May 24, 2011, and found "no significant compression of the neural elements at any level" (Tr. at 639).

Dr. McPeak performed a Mental Assessment of Ability to do Work-Related Activities of Claimant on November 9, 2011 (Tr. at 701). Dr. McPeak assessed Claimant's ability to make the following adjustments:

1. Follow work rules - moderate.

2. Relate to co-workers - slight.

3. Deal with the public - extreme.

4. Use judgment - moderate.

5. Interact with supervisors - marked.

6. Deal with work stresses - extreme.

7. Function independently - none.

8. Maintain attention/concentration - marked.

Dr. McPeak described Claimant's limitations that supported the above adjustments to include persistent depression and anxiety (Tr. at 700). Claimant's limitations included that he frequently feels he is being mistreated by supervisors and gets into inter-personnel conflicts.

(*Id.*)   Claimant's performance adjustments representing his ability to adjust to a job were reported as follows:

1.      Understand, remember and carry out complex instructions - extreme.

2.      Understand, remember and carry out detailed, but not complex job instructions - marked.

3.      Understand, remember and carry out simple job instructions - moderate.

Dr. McPeak's performance limitations were based upon the medical opinion that Claimant suffers from significant memory and attention problems, secondary to anxiety and depression.  (*Id.*)  Dr. McPeak assessed Claimant's ability to make personal social adjustments as follows:

1.      Maintain personal appearance - none.

2.      Behave in an emotionally stable manner - moderate.

3.      Relate predictably in social situations - extreme.

4.      The ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods - extreme.

Dr. McPeak described Claimant's limitations to support social adjustments to include social anxiety and severe depression interference with social situation and work environment (Tr. at 701).  Dr. McPeak reported that Claimant would need frequent breaks in order to be in a work environment and it would interfere with his pace.   Dr. McPeak reported that Claimant's significant back pain would affect Claimant's work-related activities.  Claimant was assessed to be able to manage benefits in his own best interest.

15

<u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant asserts that the ALJ failed to accord adequate weight to Claimant's treating psychiatrist, according to 20 C.F.R. §§ 404.1527 and 416.927, committed reversible error by failing to assess the mental residual functional capacity opinion of a treating source psychiatrist and failed to find Claimant's bipolar disorder and panic disorders to be severe (ECF No. 11). The Commissioner argues that substantial evidence supports the Commissioner's decision that Claimant is not disabled under the Social Security Act.

<u>Treating Physician Analysis</u>

In evaluating the opinions of treating physicians, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. § 404.1527(d)(2) (2012). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." *Ward v. Chater*, 924 F. Supp. 53, 55 (W.D. Va. 1996); *see also*, 20 C.F.R. § 404.1527(d)(2) (2012). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. §§ 404.1527(d)(2) and 416.927 (2012). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact and resolve conflicts of evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1994).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927.  These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization and (6) various other factors.  Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. § 404.1527(d)(2).

Claimant's treating psychiatrist, Dr. McPeak, opined that Claimant was "unable to maintain employment for prolonged periods of time in part due to his persistent depression and anxiety which have affected his social interaction and task performance."  The ALJ gave some weight to Dr. McPeak but found that the severity of Dr. McPeak's opined limitations was not supported by the totality of the record (Tr. at 20).  Dr. McPeak's responses on the  WVDDS Routine Mental Form were inconsistent with his own office visits notes (Tr. at 308-311).  Claimant inconsistently reported experiencing depression and denying any symptoms of depression or low mood.

Dr. Harlow completed mental assessment forms and opined that Claimant had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation.  The ALJ gave significant weight to Dr. Harlow's opinion as it was supported by the evidence of the record (Tr. at 20).

Evaluating Mental Impairments

Claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06 of 20 C.F.R. 404 Subpart P, Appendix 1. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme.

The first area of the "'B" criteria, "'activities of daily living", includes adaptive activity such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for grooming and hygiene, using the telephone and directories, using the post office, etc. The ALJ held that Claimant has mild restriction in activities of daily living. Claimant drove himself to the administrative hearing. Claimant reported to mowing the lawn, vacuuming, washing dishes, driving, shopping and watching TV (Tr. at 287).

The second area of the "B" criteria, social functioning, refers to an individual's capacity to interact appropriately and communicate effectively with others. The ALJ held that Claimant has moderate difficulties in social functioning. Claimant attends church. He testified to participating in American Legion activities and attending a car show (Tr. at 14, 42).

The third criterion, concentration, persistence, or pace, refers to the ability to sustain focused attention sufficiently long enough to permit timely completion of tasks commonly found in work settings. The ALJ held that Claimant has moderate difficulties in concentration, persistence or pace (Tr. at 14). Claimant testified to watching hours of

television on a regular basis (Tr. at 34-35).  Claimant asserted that he could not pay bills or manage bank accounts, however, Claimant's treating psychiatrist, Dr. McPeak, reported on Claimant's Mental Assessment of Ability to do Work-Related Activities on November 9, 2011, that Claimant was capable of managing benefits in his own best interest (Tr. at 701).

As for episodes of decompensation, Claimant has experienced no episodes of decompensation, which have been of extended duration.  Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph   B" criteria are not satisfied.

Section "C" of Listings 12.04 and 12.06 requires analysis of whether Claimant's mental illness is currently attenuated by medication or therapy but nevertheless has caused repeated episodes of decompensation  of extended duration, inability to adjust to even minimal workplace changes due to residual disease process, or inability to function outside a highly supportive living arrangement for at least one year; or causes complete inability to function independently  outside the area of one's  home.  There is no documentation in this record to indicate the claimant  meets said requirement.  The ALJ held that there was no evidence of any anxiety related disorder that has resulted in Claimant's complete inability to function independently outside the area of his home (Tr. at 15).  Claimant drives, shops, attends church and participates in American Legion activities, all of which requires Claimant to function outside of his home.

Lumbar Pain

Listing 1.04, which Claimant asserts he meets or equals, requires the following:

Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively. 20 C.F.R., Pt. 404, Subpt. P., App. 1, § 1.04 (2012).

Claimant testified that he was unsure how he initially injured his back. Claimant underwent a microdiscectomy in December 2007. Claimant returned to work following the surgery at full duty without restriction (Tr. at 340). On March 18, 2008, Claimant reported pain symptoms in his back, neck and right thigh in an examination performed by Dr. Shramowiat. Dr. Shramowiat diagnosed Claimant with greater occipital neuralgia. Dr. Shramowiat treated Claimant with nerve block injections with some symptom improvement. On March 15, 2010, Dr. Shramowiat's Progress Note states that Claimant previously underwent a surgery performed by Dr. Crow (Tr. at 334). "Over the past month he has developed increasing low back pain which does cause some radiculopathy to the right lower extremity. I am unsure why he is having more symptoms."

On September 13, 2010, Dr. Franyutti performed a Physical Residual Functional Capacity Assessment of Claimant (Tr. at 280-287).  Although Claimant complained of back pain, sleep disturbance and headaches, Claimant reported to mowing the lawn, vacuuming, washing dishes, driving, shopping and watching television.  Dr. Franyutti found Claimant to be "partially credible." (*Id.*)

The ALJ held that Claimant failed to meet the requirements of Listing 1.04 for Severe Back Impairments. Dr. Crow's chart notes following Claimant's lumbar microdiscectomy surgery on the L5-S1 state that the nerve root was not significantly compressed.  A month after Claimant's lumbar microdiscectomy surgery on the L5-S1, Dr. Crow recommended Claimant "go back to work full duty whenever he would like" (Tr. at 641).  Dr. Crow's notes state that Claimant was happy with the outcome and told Dr. Crow that "he has had essentially complete resolution of his leg symptoms."

Credibility Determination

It is well-settled that a claimant's allegations alone will not establish that he is disabled. *See*, 20 C.F.R. § 404.1529 and *Craig v. Chater*, 76 F.3d 585, 594-595 (4th Cir. 1996).  While the ALJ must seriously consider a claimant's subjective complaints, it is within the ALJ's discretion to weigh such complaints against the evidence and to reject them. *See*, 20 C.F.R. § 404.1529 and *Craig*, 76 F.3d at 595.  As the fact-finder, the ALJ has the exclusive responsibility for making credibility determinations.  *See*, *Shively v. Heckler*, 739 F.2d 987, 989-990 (4th Cir. 1984) (stating that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight").

The ALJ noted that the record contains inconsistencies.  The ALJ pointed out that Claimant alleged an onset date of March 1, 2009, although the record contains no evidence of any specific trauma or injury related to that date, but the record indicated Claimant was laid off from work in March 2009 (Tr. at 19).   The ALJ addressed Claimant's testimony of severity of pain being inconsistent with Dr. Crow's notes stated above.  (*Id.*)  The ALJ held that the Residual Functional Capacity Assessments supported by testimony at the administrative hearing and the evidence of record led the ALJ to determine that Claimant does experience pain and some symptoms of anxiety and depression, but that the limitations from any of these conditions, either singly or in combination, would not totally preclude all work activities (*See* Tr. at 20).

Vocational Expert Testimony

At the hearing, the ALJ asked Vocational Expert Patricia McFann if there are jobs that exist in the national economy for a hypothetical individual with the same age, education and work experience as Claimant with the limitations of not working with the general public, occasional interaction with supervisors and coworkers and no requirement of sustained attention for skilled work.  Vocational Expert McFann testified that given all the factors, the hypothetical individual would be able to perform unskilled jobs such as dowel inspector, assembler and machine operator (Tr. at 46-47).

Conclusion

For the reasons set forth above, it is hereby respectfully RECOMMENDED that the presiding District Judge AFFIRM the final decision of the Commissioner, DENY Plaintiff's Brief in Support of Judgment on the Pleadings and DISMISS this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby FILED, and a copy will be submitted to the Honorable Thomas E. Johnston.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, Judge Johnston and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

Date:   November 18, 2013.


Dwane L. Tinsley
United States Magistrate Judge